UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

RAUL DAVIS,                                        :

                        Petitioner,       :

      -against-                             :

THE PEOPLE OF NEW YORK STATE,     :

                       Respondent.       :

--------------------------------------------------------x

```
┌──────────────────────────────────┐
│ USDC SDNY                         │
│ DOCUMENT                          │
│ ELECTRONICALLY FILED              │
│ DOC #: _____          │
│ DATE FILED:  05/18/2011           │
└──────────────────────────────────┘
```

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
SIDNEY H. STEIN**

07 Civ. 9265 (SHS) (FM)

**FRANK MAAS**, United States Magistrate Judge.

I.    Introduction

       Pro se petitioner Raul Davis ("Davis") brings this habeas proceeding, pursuant to 28 U.S.C. § 2254, to challenge his conviction on charges of Murder in the Second Degree and Criminal Possession of a Weapon in the Second and Third Degrees, following a jury trial in Supreme Court, Bronx County.  On April 15, 2003, Justice Robert Straus, before whom the case was tried, sentenced Davis to concurrent terms of imprisonment which, in the aggregate, amount to a sentence of twenty-five years to life.

       The charges against Davis arose out of his role in the shooting of a young man in a bodega.  In his habeas petition ("Petition" or "Pet."), as supplemented by his state court motion to vacate the judgment of conviction, Davis contends that:  (a) the trial court violated his Sixth Amendment rights to present a defense and to confront the witnesses against him; (b) the trial court violated his Fourteenth Amendment due process rights through evidentiary errors; (c) his sentence was unduly harsh; and (d) his trial

counsel provided ineffective assistance because he failed to present evidence of the victim's gang involvement.

For the reasons that follow, the Petition should be denied. Additionally, pursuant to 28 U.S.C. § 2253(c)(2), Davis should be denied a certificate of appealability since he has failed to make the necessary showing of the denial of a constitutional right.

II.   Trial

A.   Background

On the night of June 25, 2001, Davis shot and killed another area teenager, Patrick Seltzer ("Seltzer"), in a bodega in the Castle Hill section of the Bronx. (T1 957-58, 1015; T2 511-13).[1] Both Davis and Seltzer were romantically involved with Carol Tyler ("Tyler"), a young woman who was pregnant with Davis' child. (T2 526, 595-96, 599).

The prosecution's theory of the case was that Davis intentionally sought out Seltzer that night. (T1 928-29). The defense theory was that the shooting was an unfortunate mistake arising out of Davis' decision to arm himself after he himself had been stabbed only three weeks earlier by three members of the Bloods street gang. (See

---

[1]      The trial transcripts are not assembled or paginated in sequential order. "T1" refers to the transcript of proceedings on February 4-7 and 10-11, 2003 (ECF Nos. 5, 6). "T2" refers to the transcript of additional proceedings on February 11, 19-21, and 24-26, 2003 (ECF Nos. 8, 9). "S." refers to the minutes of Davis' sentencing on April 15, 2003. "Ex." refers to the exhibits annexed to the Affidavit of Assistant District Attorney Mary Jo Blanchard, sworn to on February 15, 2008 (ECF No. 4). "Killian Ex." refers to the exhibits annexed to the Supplemental Declaration in Opposition of Assistant District Attorney Nancy Killian, dated January 28, 2010 (ECF No. 14).

id. at 932).  Davis contended that Seltzer was a member of the Bloods, and that the

shooting was justified because he thought Seltzer was about to draw a weapon against

him.  (T2 512-13).

 B. People's Case

  The People's evidence, taken in the light most favorable to the prosecution,

would have permitted a reasonable juror to find as follows:

  1. Shooting

  At approximately 9:30 p.m. on June 25, 2001, inside a bodega located at

610 Castle Hill Avenue in the Bronx, Davis fired one shot from a handgun.  (T1 957-58;

T2 206-07, 511-13).  Seltzer, who was in the bodega at the time, was hit and died at an

area hospital a short time later.  (T1 941; T2 512).  When he was questioned by Detective

Michael Carroll ("Det. Carroll") of the New York City Police Department ("NYPD")

several days after the shooting, Davis confessed to the shooting.  (T2 206-07).

  At the time of the shooting, Davis was nineteen years old and Seltzer was

fifteen years old.  (T1 937; T2 515).  The two young men knew each other because they

both played basketball at the Castle Hill Houses recreation center.  (T2 507).  They also

had an additional connection through Tyler, who was pregnant with Davis' child.  (Id. at

336-37).  Months prior to the shooting, during a period when Davis and Tyler were not a

couple, Seltzer and Tyler spent time together.  (Id. at 601; see id. at 596, T1 950).

  On the day of the shooting, Davis traveled to the Castle Hill area from his

own neighborhood elsewhere in the Bronx to see Tyler, whose birthday was the following

day.  (See T2 336, 521).  Tyler and Davis spent time at a nail salon and then walked down

Castle Avenue to buy oranges.  (Id. at 338-40).  Subsequently, Tyler accompanied Davis

to a public bus, which he boarded to return home.  (Id. at 346).  At some point, however,

Davis disembarked and returned to the vicinity of 610 Castle Avenue.  (See id. at 591).

There, he encountered Seltzer.  (Id.).  When Seltzer asked him if he had "been messing

with Carol in the past couple of months," Davis felt uneasy and denied that he had.  (Id. at

187-89, 204-05).  Davis then spoke to another young man named Shareef, whom he

believed was attempting to "stall" him.  (Id. at 206, 211-12).

 Soon thereafter, Davis walked into the bodega, where he encountered

Seltzer, who was walking out.  Davis told the police that he saw Seltzer "reaching for his

waist[band]," whereupon he drew his own firearm and shot Seltzer from just inside the

entry door.  Davis then "[took] off" and "[ran] behind some cars to get some cover."  (Id.

at 207).  Four men working in the bodega heard the shot, but did not see the shooter.  (Id.

at 57, 84, 356, 384-86).

 Although Davis claimed in his statement to the police that he shot Seltzer in

self-defense, (id. at 212), Seltzer was not armed.  (T1 1010, 1082, 1094; T2 49, 65, 105,

129, 370).  Indeed, rather than being shot as he was confronting Davis, Seltzer was shot in

the back of the head.  (T2 427-28).

 2. Testimony of Latanya Seltzer

 The first witness called by the People was Seltzer's mother, Latanya Seltzer

("Ms. Seltzer"), who did not witness the shooting.  Rather, her testimony provided

4

background information about her son's relationship with Tyler and the origin of her son's nickname, "Woga."

Ms. Seltzer testified that her son became involved with Tyler approximately two months before the shooting.  (See T1 950).  Around that time, Ms. Seltzer witnessed an argument between the two of them, during which Seltzer said to Tyler, "Get out my house, I don't want you here."  (Id.).  After this argument, Tyler no longer visited the Seltzer home, and it was Ms. Seltzer's understanding that their relationship was over. (See id. at 950-53).

Ms. Seltzer also explained that the nickname "Woga," by which everyone, including Davis, knew Seltzer, grew out of a phrase she used to say to him when he was a toddler suffering from a respiratory illness.  (Id. at 948).  According to Ms. Seltzer, uttering the silly phrase was the only thing that could keep Seltzer calm when he could not breathe.  (Id. at 948-49).

Ms. Seltzer also gave undeniably emotional testimony about the night of the shooting.  She stated that after the shooting, "[o]ne of [Seltzer's] friends came banging, screaming, hollering on my door 'Patrick just got shot in the head, Patrick just got shot in the head.'"  (Id. at 938).  When she ran across the street in an attempt to enter the bodega, a police officer told her that she did not "need to see him like that."  (Id. at 939-40). Later, at the hospital, a doctor informed her that the hospital staff did everything that they could, but that Seltzer had died.  The doctor then hugged Ms. Seltzer as she started crying.  (Id. at 941).  After gathering her strength, Ms. Seltzer opened the curtain to her

son's hospital bed and saw a bullet protruding from his head, which was covered with a big piece of bloody gauze.  (Id.).

Ms. Seltzer testified further that her son was attending Dewitt Clinton High School at the time of his death, that he was "very nice looking" and that he had received a scholarship at the age of twelve to attend a basketball camp.  (Id. at 943-44).  Through Ms. Seltzer, the prosecutor also introduced three photographs of Seltzer with members of his family celebrating happy occasions.  (Id. at 944-48; Ex. 11).  Ms. Seltzer testified that these photographs showed the way Seltzer appeared before he was killed.  (T1 945).

Finally, Ms. Seltzer explained that, on the night of the shooting, her son had gone to the bodega, at the request of his niece, to purchase a cake.  (Id. at 953).

Davis' counsel did not object to the substance of Ms. Seltzer's testimony and did not cross-examine her.  (See id. at 954).

C.   Defense Case

1.   Davis' Testimony

Davis was the only defense witness.  He testified that three members of the Bloods street gang stabbed him on June 2, 2001, causing him to be hospitalized for five days.  (T2 489, 492-93).  After he returned home, Davis acquired a gun on the day of the shooting because he feared another attack.  (Id. at 494).[2]

---

[2]      Davis explained that he "didn't really pay for [the gun] because it was like [he] was borrowing it" for the day.  (Id. at 556, 557).  He did, however, give the gun's owner forty dollars.  (Id. at 557).  He also acknowledged, albeit grudgingly, that he had told an assistant district attorney, in a videotaped confession only a few days after the shooting, that "any time I

(continued...)

6

According to Davis, at the time of the shooting, Tyler was his girlfriend, and was expecting his child.  (Id. at 498, 501).  The shooting took place the day before Tyler's birthday, when Davis had gone to the Castle Hill neighborhood to see her.  (Id. at 499).  At that time, Davis allegedly did not know that Tyler had been romantically involved with Seltzer.  He was aware, however, that Seltzer and Tyler had been together around Thanksgiving 2000.  (Id. at 501, 599, 601).

Davis denied boarding a bus before the shooting to leave the neighborhood. He testified that he instead had dropped Tyler at her house and was headed to the bodega to get change for the bus.  (Id. at 500, 602).  As he approached the store, Davis encountered Seltzer, whom he knew to be a member of the Bloods, and a group of Seltzer's friends.  (Id. at 508-09).  Davis testified that Seltzer appeared angry and asked Davis if he still was "with" Tyler.  (Id. at 501).  Then, another member of the group, named Andre, gave him a "pound," or "handshake," but "stopped [Davis as they were] in the motion," which Davis found strange because their greeting usually included a brief embrace.  (Id. at 504).  This led Davis to believe that Andre was carrying a gun.  (Id.). After Davis greeted Andre, another man named Shareef called Davis over to speak to him.  (Id. at 508-09).  Because Shareef "really wasn't saying anything," Davis thought he

---

[2](...continued)
usually went up there [i.e., to Castle Hill], . . . and any time I know that I was gonna go somewhere, a distance by myself, I would carry it because I didn't know who I was going to run into."  (Id. at 577).  This statement, of course, was inconsistent with the notion that Davis first "borrowed" the gun on the day of the shooting.

was being stalled to permit other Bloods gang members to gather a few feet away.  (Id. at 509-10).  Davis surmised that the group was about to "jump" him.  (Id. at 510-11).

Davis testified that in a effort to get away from the assembled group, he walked toward the bodega.  As he entered the store, Seltzer was exiting.  As Davis explained, Seltzer was

> . . . looking at me but he's looking like a real angry look on his face, you know what I mean, and he had his hand by towards his waist and . . . I saw him reaching and when I saw him reaching, I felt that he had a gun.  I thought he was pulling out a gun on me.

(Id. at 511-12).  Because of his prior encounter with the young men outside the bodega, Davis had placed his hand on the gun inside his pocket and was ready to use it when he walked inside.  (Id. at 627).  He then fired his gun and ran out of the store.  (Id. at 513).  Davis testified that he did not stop to see if Seltzer had been hit, and did not learn that Seltzer had been injured until his mother told him the next day that the police were looking for him.  (Id. at 513-14).

2.    Proffer of a Videotape Concerning Davis' Stabbing

On June 7, 2001, while he still was in the hospital, Davis recorded videotaped testimony about the stabbing incident so that it could be presented to a grand jury.  Before presenting the defense case, Davis' counsel advised the court that he wanted to play that videotape.  (Id. at 402-04).  Davis' counsel proffered the videotape as evidence of his client's state of mind on June 25, 2001, the date of the Seltzer shooting.

(Id. at 403).  Justice Straus initially determined that the tape was admissible because it was not offered as a prior consistent statement, but, rather, as evidence of Davis' state of mind.  (Id. at 407-09).  As Justice Straus explained:  "There's nothing in the videotape itself about gangs, about Bloods, about anything that could be considered prejudicial in that regard to the People's position.  It goes to state of mind and nothing else."  (Id. at 412).  The Justice further determined that Davis could testify about his wounds from the stabbing and show his scars to the jurors to help them understand his mental state.  (Id. at 415-16).

Later the same day, Justice Straus reversed his ruling, reasoning that the videotape constituted inadmissible hearsay unless it was offered to prove Davis' state of mind on the date of the tape.  He further concluded that "what [Davis] said on that earlier occasion does not reflect [his] state of mind on the date of occurrence and if the claim is that it did, then it is offered for the truth of its contents and is therefore, inadmissible hearsay."  (Id. at 453-54).  Justice Straus therefore ruled that Davis could "testify to the actions of his attackers on the date of that incident . . . [,] to being in the hospital[,] and [to] his wounds and his state of mind.  He can testify to that but he cannot use the video tape that was in the grand jury testimony for that purpose."  (Id. at 454).  In his oral decision, Justice Straus also observed that, in light of the testimony that Davis would be permitted to give, the videotaped grand jury testimony would be cumulative and would shift the emphasis of the trial away from the shooting.  (Id.).

3.      <u>Seltzer's Alleged Gang Involvement</u>

Among the People's witnesses were Police Officer Edward Herrera ("Officer Herrera"),[3] of the 43rd Precinct, and Lieutenant Michael Sullivan ("Lt. Sullivan"), of the Housing Authority Gang Unit, two of the first police officers to respond to the shooting.  (T1 1005-09; T2 96-102).  Officer Herrera testified on direct that Seltzer was lying on the floor and bleeding when he arrived, but that there was no weapon in Seltzer's vicinity.  (T1 1010).  Officer Herrera also identified Seltzer's clothing, which he had recovered from the hospital.  (<u>Id.</u> at 1017, 1019-20).

During cross examination, Davis' attorney attempted to ask Officer Herrera about gang activity in the Castle Hill neighborhood, a subject that had not been broached during the Officer's direct testimony.  (<u>Id.</u> at 1030-32).  Justice Straus sustained the prosecutor's objection to that questioning, saying "I don't see any relevance to it.  It calls for speculation.  It's going to make the jury think about things that, right now, aren't connected to this case."  (<u>Id.</u> at 1031).  Although Davis' attorney represented that Seltzer's sister was making a Bloods "kill signal" with her hand in one of the family photographs previously introduced into evidence during Ms. Seltzer's testimony, Justice Straus adhered to his ruling that the proposed testimony concerning gangs was not relevant "at this time."  (<u>Id.</u> at 1032).  According to Ms. Seltzer, the photograph depicted Seltzer, his younger sister, and two of his teachers in a ballroom where he was celebrating

---

[3]      Officer Herrera's name also is spelled "Herrara" in the trial transcript.

his junior high school graduation.  (Id. at 946-47).  In the photograph, Seltzer, his sister, and at least one of the teachers appear to be smiling.  (Ex. 11).

Despite the court's ruling, Davis' counsel subsequently attempted to cross-examine Officer Herrera about the photograph of Seltzer and his sister, asking whether he "recogniz[ed her] hand gesture as being a symbol of anything."  When the prosecutor again objected to this line of inquiry, Justice Straus sustained the objection.  (Id. at 1046).  At a sidebar a few moments later, Justice Straus said,

> I thought I made it clear that [testimony about gangs] wasn't part of the case, certainly not at this time, . . . . and any such so-called gestures, there wasn't to be any reference to. . . . I'm telling you now, this isn't going to be anything about gangs brought into the case.  Unless there's some foundation, which there is none now.  And you can't lay it by asking some witness if he thinks it's some sign given by somebody as some sort of gang sign.  It's not going to come out.

(Id. at 1050, 1052).

Subsequently, when Lt. Sullivan testified, defense counsel renewed his request that he be permitted to inquire about gang activity in the neighborhood because Davis had mentioned that subject in his statements to Det. Carroll in the aftermath of the shooting.  (T2 111-13).  Justice Straus ruled that the proposed cross examination still was not relevant, but that he would "direct the [Assistant District Attorney] to make [Lt. Sullivan] available for you, if he would have anything relevant to say later on."  (Id. at

11

113).  Despite this accommodation, Davis' attorney never sought to recall Lt. Sullivan or any other prosecution witness to provide further evidence about gangs.

>D.   Conviction and Sentencing

On February 26, 2003, the jury convicted Davis on three counts:  Murder in the Second Degree (intentional murder), Criminal Possession of a Weapon in the Second Degree, and Criminal Possession of a Weapon in the Third Degree.  (Id. at 1307).  Davis was acquitted on a fourth count, which charged him with Murder in the Second Degree on a depraved indifference theory.  (Id. at 1307; see id. at 1230).

On April 15, 2003, Justice Straus sentenced Davis to concurrent sentences of twenty-five years to life on the second-degree murder count, fifteen years on the second degree weapon possession count, and seven years on the third degree weapon possession count.  (S. 31-32).

III.   Subsequent Procedural History

>A.   Direct Appeal

Davis appealed his conviction to the Appellate Division, First Department, contending that (1) the trial court violated his Sixth and Fourteenth Amendment right to present a defense by precluding him from introducing his grand jury testimony concerning the earlier stabbing, (2) the trial court violated his Fourteenth Amendment due process rights by allowing Ms. Seltzer to testify about her son's good character and precluding the defense from cross examining certain witnesses about the photograph

containing Seltzer's sister's gang sign in an effort to prove that Seltzer had a gang affiliation, and (3) the sentence imposed was unduly harsh.  (Ex. 1).

On April 17, 2007, the Appellate Division unanimously affirmed Davis' conviction.  See People v. Davis, 39 A.D.3d 345 (1st Dep't 2007).  Turning first to Davis' justification defense, the court held that his taped grand jury testimony would not "have added anything" since the trial court "permitted [him] to give extensive testimony about the stabbing and how it affected his state of mind at the time he shot the deceased."  Id. at 345.  Accordingly, the Appellate Division found that the trial court "properly exercised its discretion" in denying Davis' request to admit the tape.  Id.

The Appellate Division also rejected Davis' claim that Ms. Seltzer's testimony deprived him of a fair trial, explaining that it was "generally relevant to various issues raised by the defendant."  Id. at 346.  The court further found that, "[t]o the extent any of this evidence was improper," the error was harmless "in light of the overwhelming evidence of defendant's guilt."  Id.

The Appellate Division further held that the trial court properly had sustained the prosecutor's objections to defense counsel's questions about the photograph allegedly depicting Seltzer's sister making a Bloods "kill" sign because, "[a]t that point in the trial, there had been no evidence of any gang involvement in the case, and no foundation had been laid."  Id.  The court noted that the trial court never made a final ruling regarding the admissibility of that evidence, leaving open the possibility that Davis could have introduced it later, after laying a proper foundation.  Id.  Indeed, the trial court

had arranged for a police witness to be "kept available" to testify for Davis regarding this subject if it became relevant.  The Appellate Division noted that, despite this accommodation, Davis "abandoned the issue."  <u>Id.</u>  The court further observed that even if Davis were able to establish that Seltzer's sister was making a kill sign, the evidence would have been of limited probative value in the absence of any showing that Seltzer was aware that his sister was using the sign.  <u>Id.</u>

Finally, the Appellate Division held that any constitutional claims arising out of the trial judge's evidentiary rulings were unpreserved and declined to review them in the interest of justice.  The court also stated, "[w]ere we to review these claims, we would reject them."[4]  <u>Id.</u>

On April 26, 2007, Davis' counsel filed a motion for reargument because the Appellate Division's decision had "overlooked [Davis'] excessive sentence argument."  (Ex. 4).  On June 26, 2007, the Appellate Division granted that motion and recalled and vacated its earlier decision, but then issued a new decision unanimously affirming Davis' conviction, <u>People v. Davis</u>, 839 N.Y.S.2d 50 (1st Dep't 2007).  The only substantive change is that the last sentence of the second decision notes that the court had "considered and rejected" both Davis' ineffective assistance of counsel arguments and "his argument that his sentence was excessive."  <u>Id.</u> at 52.

_____

[4]     In the last sentence of its decision, the Appellate Division declared that it had "considered and rejected [Davis'] ineffective assistance of counsel arguments."  <u>Id.</u>  This statement is curious since Davis had yet to raise an ineffective assistance of counsel claim, other than in passing.  (<u>See</u> Ex. 1 at 33).

On May 7, 2007, Davis' counsel submitted a letter to the Court of Appeals, requesting leave to appeal based on each of the issues raised in his direct appeal.  (Ex. 7).  On June 5, 2007, counsel submitted a more detailed follow-up letter to Judge Theodore T. Jones, in which he also argued that trial counsel had provided ineffective assistance by failing to object to "extensive victim worth testimony and to photographs depicting the victim while alive."  (Id. at 4).

On July 26, 2007, Judge Jones denied Davis' application for leave to appeal.  People v. Davis, 9 N.Y.3d 864 (2007).

B.      Habeas Petition

Davis timely filed his Petition on September 27, 2007.  In the Petition, to which his Appellate Division brief is annexed, Davis asserts the same three claims raised before the Appellate Division.  (ECF No. 1).  The Respondent answered that Petition on February 13, 2008.  (ECF No. 4).

Thereafter, on April 18, 2008, Davis moved for a stay so that he could return to state court to exhaust his state court remedies with respect to an ineffective assistance of counsel claim.  (ECF No. 11).  In the interim, Your Honor had referred this case to me for a report and recommendation.  (ECF No. 2).  On May 6, 2008, I granted the stay motion.  (ECF No. 12).

C.      Additional Applications for Collateral Review

On June 4, 2008, Davis filed a pro se motion in Supreme Court, Bronx County, to vacate his judgment of conviction under New York Criminal Procedure Law

15

("CPL") § 440.10.  (Killian Ex. 1).  Davis contended that his trial attorney was ineffective because he had failed to examine the prosecution witnesses about Seltzer's gang involvement, despite the trial judge's willingness to reconsider admitting the evidence if counsel laid a proper foundation.  (Id.).

On January 15, 2009, Justice Barbara F. Newman denied Davis' motion.  In her decision, the Justice observed that Davis failed to provide an affidavit from any prosecution witness showing that "the Bloods street gang was somehow involved in the shooting" and had not shown that cross-examination of a police witness concerning the photograph of Seltzer and his sister could establish that proposition.  (Killian Ex. 3 at 4). Citing CPL § 440.30(4)(b), the Justice concluded that Davis therefore had failed to present "sworn allegations substantiating or tending to substantiate all the essential facts" to support his claim and had not met his "burden of demonstrating the absence of strategic or other legitimate explanations for the alleged deficiencies in his trial counsel's conduct."  (Id. at 4, 6).  As the Justice explained, even if the trial court had received testimony that Seltzer's sister's gesture was a Bloods signal, that "would not have been sufficient to establish that there was gang involvement in the shooting or to lay a foundation for the submission of other evidence thereof."  (Id. at 5).  Moreover, as the Justice further noted, had defense counsel attempted to fill the void by calling Seltzer's sister as a witness, the strategy would have entailed "great risk" given the "natural animosity which she would have harbored against the admitted killer of her brother." (Id.).  In these circumstances, Justice Newman held, Davis had not overcome the

presumption that his counsel's performance at trial was competent.  (Id. at 6).  Davis

sought leave to appeal from this decision, which application the Appellate Division

denied on May 5, 2009.  (Killian Ex. 4).

       After Davis submitted a copy of the decision on his motion for collateral

relief to the Court, the Respondent filed further papers on January 28, 2010.  (ECF No.

14).  The Petition is therefore ripe for review.

IV.   Discussion

     A.   Standard of Review

       A habeas corpus petition is not a vehicle to relitigate every issue previously

determined in state court.  Herrera v. Collins, 506 U.S. 390, 401 (1993).  Rather, a state

prisoner seeking habeas relief must show that he is "in custody in violation of the

Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The

petitioner bears the burden of proving, by a preponderance of the evidence, that his rights

have been violated.  Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997).

       Section 2254, as amended by the Antiterrorism and Effective Death Penalty

Act of 1996 (AEDPA), provides in part that:

> An application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the
> merits in State court proceedings unless the adjudication of the
> claim . . . resulted in a decision that was contrary to, or involved
> an unreasonable application of, clearly established Federal law,
> as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d) (emphasis added).

As the Second Circuit noted in <u>Jones v. Stinson</u>, 229 F.3d 112 (2d Cir. 2000), the Supreme Court has "construed the amended statute so as to give independent meaning to 'contrary [to]' and 'unreasonable.'  Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  <u>Id.</u> at 119 (citing <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000)).  Under the "unreasonable application" clause, a federal habeas court should "ask whether the state court's application of clearly established federal law was objectively unreasonable."  <u>Williams</u>, 529 U.S. at 409.  This standard does not require that reasonable jurists would all agree that the state court was wrong.  <u>Id.</u> at 409-10.  Rather, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'"  <u>Stinson</u>, 229 F.3d at 119 (quoting <u>Francis S. v. Stone</u>, 221 F.3d 100, 109 (2d Cir. 2000)).

Section 2254 further authorizes the federal courts to grant a petition for a writ of habeas corpus when a claim considered on the merits in state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

Finally, to the extent that a habeas petition challenges factual findings, Section 2254 provides that "a determination of a factual issue by a State court shall be presumed to be correct" and that "[t]he [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  <u>Id.</u> § 2254(e)(1).

18

"If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody . . . violates the Constitution, that independent judgment should prevail."  <u>Williams</u>, 529 U.S. at 389.

B.    <u>Exhaustion</u>

Davis' Petition may not be granted unless he has exhausted all available state court remedies, <u>or</u> there is an absence of state corrective process, <u>or</u> circumstances render that process ineffective to protect his rights.  <u>See</u> 28 U.S.C. §§ 2254(b)(1)(A)-(B). As a defendant charged with crimes in New York State, Davis unquestionably had an effective process available to him through the existing state statutes governing appeals. <u>See</u> N.Y. CPL §§ 450.10 (direct appeal to Appellate Division as of right), 450.15 (discretionary appeal to Appellate Division from denial of motion to vacate judgment), 450.90 (discretionary appeal from adverse Appellate Division ruling).  Therefore, to satisfy the exhaustion requirement with respect to a particular federal claim, Davis must show that he presented the substance of "the same federal constitutional claim[] . . . to the highest court in the . . . state."  <u>Aparicio v. Artuz</u>, 269 F.3d 78, 89-90 (2d Cir. 2001) (internal citations and quotation marks omitted).

"A federal constitutional claim has not been fairly presented to the [s]tate courts unless the petitioner has informed those courts of 'all of the essential factual allegations' and 'essentially the same legal doctrine he asserts in his federal petition.'" <u>Strogov v. Att'y Gen. of N.Y.</u>, 191 F.3d 188, 191 (2d Cir. 1999) (quoting <u>Daye v. Att'y Gen. of N.Y.</u>, 696 F.2d 186, 191-92 (2d Cir. 1982)).  To meet this requirement, it is not

necessary that the federal constitutional claim be presented to the state courts in <u>haec verba</u>.  Rather, there are a number of ways in which the claim may be presented, including:

> [1] reliance on pertinent federal cases employing constitutional analysis, [2] reliance on state cases employing constitutional analysis in like fact situations, [3] assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and [4] allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

<u>Daye</u>, 696 F.2d at 194.

In his direct appeal, Davis argued that his sentence was "too harsh" because he was "a first felony offender, who ha[d] some employment history, and ha[d] from the outset expressed remorse for his crime."  (Ex. 1 at 38).  In advancing this argument, Davis relied exclusively on state law cases and made no reference to the United States Constitution.  (<u>Id.</u> at 37-38).  Accordingly, Davis' present sentencing claim is not properly exhausted.  <u>See</u> <u>Daye</u>, 696 F.2d at 194.  The Court nevertheless may deny an unexhausted claim on the merits without requiring a petitioner to return to state court.  <u>See</u> 28 U.S.C. § 2254(b)(2).  For this reason, I have considered Davis' sentencing claim below.

      C.    <u>Procedural Default</u>

A federal court also is precluded from reviewing a habeas claim when the state court's prior denial of that claim rests on an adequate and independent state ground.  <u>E.g.</u>, <u>Harris v. Reed</u>, 489 U.S. 255, 262 (1989); <u>Wainwright v. Sykes</u>, 433 U.S. 72, 81

(1977).  A failure to comply with state procedures for properly raising a claim qualifies as such an adequate and independent state ground, Harris, 489 U.S. at 262, unless the petitioner can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law, or . . . that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991); Glenn v. Bartlett, 98 F.3d 721, 724 (2d Cir. 1996); accord Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 809 (2d Cir. 2000).

To establish cause for a default, a petitioner must adduce "some objective factor external to the defense" which explains why he did not raise the claim previously. Murray v. Carrier, 477 U.S. 478, 488 (1986); Gonzalez v. Sullivan, 934 F.2d 419, 422 (2d Cir. 1991).  A showing of prejudice requires a petitioner to demonstrate that the failure to raise the claim previously had a substantial injurious effect on the petitioner's case such that he was denied fundamental fairness.  Reyes v. New York, No. 99 Civ. 3628 (SAS), 1999 WL 1059961, at *2 (S.D.N.Y. Nov. 22, 1999).  Finally, to establish a fundamental miscarriage of justice, a petitioner must demonstrate that he is "actually innocent." Aparicio, 269 F.3d at 90.  As the Supreme Court has indicated, the "miscarriage of justice exception is concerned with actual as compared to legal innocence." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Sawyer v. Whitley, 505 U.S. 333, 339 (1992)).  A claim of actual innocence therefore must be supported by "new reliable evidence." Schlup v. Delo, 513 U.S. 298, 324 (1995).  For this reason, "claims of actual innocence are rarely successful." Id.

21

Here, Justice Newman denied Davis' ineffective assistance of counsel claim because he failed to provide the evidentiary support required by New York law.  (See Killian Ex. 3 at 4; CPL § 440.30).  It follows that this claim is procedurally barred unless Davis can demonstrate either cause and prejudice or a fundamental miscarriage of justice. In his papers, Davis fails to make either of these required showings.  Thus, he has provided no explanation for his failure to submit any evidence establishing that Seltzer was a member of the Bloods gang.  Davis also is unable to establish any prejudice since he himself was permitted to testify that Seltzer was a Bloods gang member.  (See T1 507-08).  Finally, this clearly is not a case in which Davis can allege actual innocence since he admits that he shot and killed Seltzer.  (See id. at 513).

Turning to Davis' constitutional claims concerning the trial court's evidentiary rulings, the Appellate Division found that they were unpreserved.  Davis, 839 N.Y.S.2d at 51.  For such a procedural default to preclude federal review, however, the state rule must be one which is "firmly established and regularly followed."  James v. Kentucky, 466 U.S. 341, 348-49 (1984); see also Lee v. Kenna, 534 U.S. 362, 376 (2002).  Here, New York's contemporaneous objection rule clearly meets this test.  See, e.g., Garvey v. Duncan, 485 F.3d 709, 717-18 (2d Cir. 2007).

To preserve his claim, Davis therefore must have objected to the evidence during trial on the same grounds that formed the basis of his appeal.  See People v. Osuna, 65 N.Y.2d 822, 824 (1985) (defendant's evidentiary objection at trial to "narrative form of witness's testimony . . . was not sufficient to preserve a contention that the

substance of a portion of the testimony was improper"); People v. Cooper, 537 N.Y.S.2d 700, 700 (4th Dep't 1989) (defendant's two objections to certain evidence during trial did not preserve his claim because "neither objection specifically questioned admissibility upon the ground now raised").  Nevertheless, Davis' trial counsel did not object to Ms. Seltzer's testimony or the introduction of the Seltzer family photographs on constitutional grounds.  (See T1 936-54).  Indeed, Davis' counsel raised only a handful of objections to Ms. Seltzer's testimony, several of which were nonspecific, (see id. at 953, 954), and he voiced no objection to the People's introduction of the photographs, (see id. at 946).  Davis' constitutional claims regarding this evidence thus are procedurally barred, unless he can demonstrate either cause and prejudice or a fundamental miscarriage of justice.

Davis cannot meet these alternative tests.  For example, Davis has not pointed to any reason why defense counsel was unable to preserve his objections during trial, and the trial transcript does not suggest such a reason.  Davis therefore cannot demonstrate cause.  Nor can he prove prejudice because the Appellate Division observed that it would have rejected Davis' constitutional claims had it reviewed them.  Davis, 839 N.Y.S.2d at 51.  Moreover, even if the trial court improperly admitted Ms. Seltzer's testimony and the family photographs, that evidence clearly was not "sufficiently material to provide the basis for conviction."  See Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998).  Indeed, Davis confessed to the shooting, both to the police in the days following the crime and to the jury during the trial.  (T2 207, 513).  Given the strength of the People's case, and the sheer implausibility of Davis' defense, it is clear that the exclusion

of Ms. Seltzer's testimony and the Seltzer family photographs would not have changed the outcome.  As noted above, Davis also cannot establish that his conviction amounts to a fundamental miscarriage of justice since even he concedes that he shot and killed Seltzer.

Both Davis' ineffective assistance of counsel claim and his constitutional claims based on the trial court's evidentiary rulings regarding Ms. Seltzer's testimony consequently are procedurally barred.  Although a federal court reviewing a habeas petition need not address such procedurally-barred claims, it is understandable that a petitioner who is serving a lengthy sentence would want the merits of his claims to be reached.  Moreover, there is always the possibility (however remote) that another court might reach a different conclusion concerning the threshold issue of procedural forfeiture. For these reasons, I also have considered the merits of Davis' procedurally-defaulted claims in this Report and Recommendation.

D.    Merits

1.    Right to Present a Defense

Citing the Sixth and Fourteenth Amendments, Davis contends that the trial court violated his right to present a defense by precluding him from introducing his videotaped grand jury testimony concerning the June 2 incident during which Bloods gang members allegedly stabbed him.  (Pet. Attach. at 23).  Davis also alleges that Justice Straus' refusal to allow cross examination concerning the Bloods kill symbol in the

24

photograph violated both his constitutional right to present a defense and his Sixth Amendment Confrontation Clause rights.  (Id. at 33-37).

"In considering whether the exclusion of evidence violated a criminal defendant's right to present a complete defense, we start with 'the propriety of the trial court's evidentiary ruling.'"  Hawkins v. Costello, 460 F.3d 238, 244 (2d Cir. 2006) (quoting Wade v. Mantello, 333 F.3d 51, 59 (2d Cir. 2003)).  Habeas corpus relief may not be granted merely because the state court committed an evidentiary error.  See Hawkins, 460 F.3d at 244.  "The inquiry, however, 'into possible state evidentiary law errors at the trial level' assists us in 'ascertain[ing] whether the [A]ppellate [D]ivision acted within the limits of what is objectively reasonable.'"  Id. (quoting Jones, 229 F.3d at 120).

In its decision, the Appellate Division concluded that Justice Straus had properly excluded the videotaped grand jury testimony because "[n]either the audio nor the visual aspect of the videotape would have added anything to [Davis'] justification defense" since Justice Straus permitted Davis to testify about the stabbing and how it affected his state of mind at the time of the shooting.  Davis, 839 N.Y.S.2d at 51.  Essentially, the court held that the evidence was properly excluded as cumulative.  This routine evidentiary call was well within the trial judge's discretion.  See, e.g., Int'l Minerals & Res., S.A. v. Pappas, 96 F.3d 586, 596 (2d Cir. 1996) (court has "discretion to exclude evidence if it is cumulative of evidence already in the record"); United States v.

25

Holmes, 44 F.3d 1150, 1157 (2d Cir. 1995) ("Absent a clear abuse of discretion, a trial judge retains a wide latitude to exclude irrelevant, repetitive, or cumulative evidence.").

  The trial court's refusal to let Davis' counsel question police witnesses about the hand signal made by Seltzer's sister in the photograph also does not give rise to a constitutional claim.  As the Appellate Division recognized, the trial court "never made a final ruling excluding this evidence; instead, it left open the possibility that [Davis] could introduce it upon a proper foundation."  Davis, 839 N.Y.S.2d at 51.  Indeed, Justice Straus instructed the prosecutor to keep Lt. Sullivan available so that he could be recalled if defense counsel established the relevance of the proposed testimony.  (T2 113).  When Justice Straus made his evidentiary ruling, there was no evidence in the record suggesting that Seltzer was a member of the Bloods gang.  Nor was there any reason to conclude that Seltzer had seen the hand signal that his sister was making at the time that the photograph was taken.  It therefore was reasonable for Justice Straus to exclude on relevance grounds any testimony concerning the Bloods "kill signal" allegedly depicted in the photograph.

  Subsequently, during the defense case, Davis testified that he was familiar with the Bloods because he lived in an area where they congregated and because some of his acquaintances were Bloods.  (T2 494).  Davis also testified that he knew Seltzer to be a member of the Bloods gang.  (Id. at 507-08).  At that stage, Davis had filled the evidentiary lacuna previously cited by Justice Straus as the basis for restricting his counsel's cross-examination of the police witnesses with respect to the alleged kill signal. Defense counsel therefore could have asked his own client about the hand signal in the

photograph or recalled one of the police witnesses to pursue that subject. The fact that counsel chose not to introduce such evidence as part of the defense case does not mean that the trial court in any way restricted Davis' opportunity to present his defense. Accordingly, the trial court's preliminary ruling during the People's case did not deprive Davis of any of his rights under the Sixth Amendment.

Moreover, even if the rulings that form the basis for Davis' Sixth Amendment claim were shown to be erroneous, to prevail in this habeas proceeding, Davis would also have to show that they were so egregious as to deprive him of a fundamentally fair trial. Rosario v. Kuhlman, 839 F.2d 918, 925 (2d Cir. 1988). Stated somewhat differently, the evidence withheld, viewed in the context of the entire record, must have created a reasonable doubt concerning the petitioner's guilt that "did not otherwise exist." Johnson v. Artus, 09 Civ. 9483 (PAC) (AJP), 2010 WL 3377451, at *16 (S.D.N.Y. Aug. 26, 2010) (citing Taylor v. Curry, 708 F.2d 886, 891 (2d Cir. 1983)). In that regard, although Justice Straus excluded the videotape, Davis had an unfettered opportunity to testify at trial about the stabbing and the alleged involvement of Bloods gang members in the incident. Indeed, the prosecutor stipulated that Davis was hospitalized for five days following the stabbing and the hospital records reflecting that stay were received in evidence without objection. (T2 480-81, 487). In his summation, the prosecutor also noted that "no one is denying" that Davis was stabbed. (Id. at 1140). In the absence of any showing that the videotape contained statements by Davis indicating that the persons who stabbed him were Bloods gang members, Davis' recorded

gand jury testimony plainly would not have changed the jury's view of this case since the prosecutor conceded that Davis was stabbed just three weeks before he shot Seltzer.[4]

Similarly, even if Davis' counsel had been permitted to establish that Seltzer's sister formed a gang hand signal while her photograph was being taken, this plainly would not suggest that Seltzer was himself a member of a youth gang.  Among other things, the photograph was taken on the occasion of Seltzer's junior high school graduation, two of the persons in the photograph are his teachers, and several of the participants are smiling.  In light of these circumstances, it seems unlikely that Seltzer's sister's hand sign could be considered evidence of her own involvement with a violent gang.  In any event, even if the jury had drawn that conclusion, the photograph clearly shows that Seltzer is looking straight ahead, not at his sister's hand.  (See Ex. 11).  There consequently is no reason to believe he was aware of her actions.

Given the overwhelming evidence of Davis' guilt, the suggestion that the jury would have inferred from the photograph that Seltzer was, in fact, a member of the Bloods gang, and therefore have accepted the justification defense and rendered a verdict of acquittal, verges on the ludicrous.  It follows that Justice Straus' decision to preclude inquiry into an alleged gang hand sign at a stage of the trial when there was no evidence that Seltzer was involved with the Bloods, without prejudice to an application to recall a

---

[4]       It appears that the videotape is, in fact, silent with respect to any gang involvement of the persons who attacked Davis.  (See T2 412 ("There's nothing in the videotape itself about gangs, about Bloods . . . ."), 536 ("I have asked my client about this very question [whether the June 2 stabbing was gang related] and he told me that A.D.A. Dan DeFilipi said to him, when you testify in front of the grand jury don't mention that.")).

police witness if the testimony later became relevant, did not deprive Davis of a fundamentally fair trial.

### 2.   Due Process

Davis' Petition also claims that the trial court violated his Fourteenth Amendment due process rights through certain of its evidentiary rulings.  Specifically, Davis challenges the admission of Ms. Seltzer's "victim worth" testimony concerning Seltzer's character, accomplishments, and talents and the admission of the photographs of him alive "on joyous occasions."  (Pet. Attach. at 29).

To prevail on these claims, Davis must show that the trial court's evidentiary error had a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  This requires Davis to establish that the evidence was "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it."  Dunnigan, 137 F.3d at 125 (quoting Johnson v. Ross, 955 F.2d 178, 181 (2d Cir. 1992)).

The suggestion that Ms. Seltzer's testimony rose to this level is, of course, belied by the fact that Davis' counsel voiced no objection to the aspects of her direct testimony that Davis now suggests were devastating.  (See T1 942-49, 953).  Indeed, defense counsel did not even cross-examine Ms. Seltzer.  (Id. at 954).

To be sure, the evidence was prejudicial.  See United States v. Jimenez, 789 F.2d 167, 171 (2d Cir. 1986) ("all evidence incriminating a defendant is, in one sense of

the term, 'prejudicial'") (emphasis in original).  Here, however, the prejudicial testimony proffered by Ms. Seltzer also was probative of disputed issues in the case.  Thus, her testimony that Seltzer was enrolled in high school and was a successful basketball player was relevant because it tended to show that he was unlikely to be a member of a violent youth gang.  Her testimony concerning Seltzer's frailty as a child similarly helped explain how he came to be known as "Woga," and helped counter any inference that he was a gang member or had a gang nickname.  Ms. Seltzer's testimony that her son had gone to the bodega to purchase a cake for his niece further established that he was not patrolling the streets hoping to find Davis so that he and other Bloods gang members could accost Davis.  Her description of her son as "tall" (and the three photographs introduced into evidence through her testimony) corroborated the prosecution's claim that Davis must have been aiming upward at Seltzer's head at the time he fired his shot.  Finally, her testimony concerning the relationship between Seltzer and Tyler helped establish Davis' motive for the shooting.

In sum, the Appellate Division properly concluded that Ms. Seltzer's testimony and the photographs were "generally relevant to various issues raised by the defendant at trial."  Davis, 839 N.Y.S.2d at 51.  Moreover, the Appellate Division further found that even if Davis were able to show that the receipt of this evidence was improper, the error would be "harmless in light of the overwhelming evidence of [Davis'] guilt."  Id.  In his papers, Davis has not shown, as he must, that these determinations were

30

unreasonable.  He therefore is not entitled to habeas relief based on any evidence

proffered through Ms. Seltzer.

### 3.    Sentencing Claim

Davis further contends that his sentence was unduly harsh and excessive.

(Pet. Attach. at 37).  However, "[n]o federal constitutional issue is presented" when a

petitioner's sentence is within the range prescribed by state law.  White v. Keane, 969

F.2d 1381, 1383 (2d Cir. 1992).  Here, Davis was convicted on charges of Murder in the

Second Degree, for which the maximum sentence is life in prison; Criminal Possession of

a Weapon in the Second Degree, for which the maximum sentence is fifteen years;

Criminal Possession of a Weapon in the Third Degree, for which the maximum sentence

is seven years.  See N.Y. Penal Law §§ 70.00(2)(a), (c), (d), 125.25, 265.02, 265.03.  The

concurrent sentences that Justice Straus imposed did not exceed these statutory limits.

Accordingly, Davis is not entitled to habeas relief on the ground that his sentence was

excessive.

### 4.    Ineffective Assistance of Counsel

Finally, Davis asserts that his trial counsel was ineffective.  (See ECF No.

11 ("Pet'r's Mot. for a Stay/Abeyance")).  In order to prevail on this claim, Davis must

demonstrate that (a) his counsel's performance "fell below an objective standard of

reasonableness" and (b) there is a "reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different."  Strickland

v. Washington, 466 U.S. 668, 688, 694 (1984); Smith v. Spisak, 558 U.S. __, 130 S. Ct.

676, 685 (2010).  Under the <u>Strickland</u> standard, there is a "strong presumption that [a lawyer's] conduct falls within the wide range of reasonable professional assistance." <u>Strickland</u>, 466 U.S. at 689.  Therefore, a petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  <u>Id.</u> (quoting <u>Michel v. Louisiana</u>, 350 U.S. 91, 101 (1955)).  As the Second Circuit has noted, "[t]he <u>Strickland</u> standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." <u>Lindstadt v. Keane</u>, 239 F.3d 191, 199 (2d Cir. 2001).

In his ineffective assistance of counsel claim, Davis alleges that his trial counsel "abandoned a critical line of cross examination of a NYPD Gang Unit officer" and failed to recall the officer after laying a foundation for his testimony, even though the trial judge suggested that he would permit it at that stage.  (Pet'r's Mot. for a Stay/Abeyance ¶¶ 11, 12; Killian Ex. 1 at 10-11 (Mem. of L. in Supp. of CPL § 440.10 Mot.)).

Davis, however, has not satisfied the requirements of <u>Strickland</u>.  At the outset, apart from his own attorney's representations to the court, there is nothing in the record which suggests that Seltzer's sister was, in fact, using a Bloods hand sign or that Lt. Sullivan, a former Housing Authority Gang Unit officer, would have been able to authenticate it as a gang "kill" signal.  Moreover, despite his initial posturing when certain prosecution witnesses were on the stand, by the time he began the defense case, Davis' counsel might well have realized that any attempt to show that Seltzer's sister, and

32

therefore perhaps Seltzer, was a member of a violent youth gang would have invited a rebuttal case, in which the People would have called Seltzer's sister to testify.  If so, the last testimony that the trial jury heard might have been Seltzer's younger sibling extolling her deceased brother's virtues, decrying his senseless death, and ridiculing the notion that either of them was a member of the Bloods.  Given this possibility, and the <u>Strickland</u> presumption that counsel acted reasonably, Davis clearly has not satisfied the first prong of <u>Strickland</u>.  (<u>See</u> Killian Ex. 3 at 5 (Decision and Order denying CPL § 440.10 motion) (noting "the great risk inherent in calling [Seltzer's sister], given the natural animosity which she would have harbored against the admitted killer of her brother")).  He therefore is not entitled to habeas relief based on his trial counsel's alleged ineffectiveness.[5]

## V.    <u>Conclusion</u>

For the foregoing reasons, the Court should deny Davis' Petition. Additionally, a certificate of appealability should not be issued because Davis has failed to make the substantial showing of the denial of a constitutional right required by 28 U.S.C. § 2253(c)(2).

---

[5]       As the state court impliedly recognized, (<u>see id.</u> at 6), because Davis has failed to establish that his lawyer's decisionmaking was objectively unreasonable, there is no need to consider whether the outcome of the trial might have been different but for counsel's failure counsel to recall Lt. Sullivan.  <u>See</u> <u>Strickland</u>, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); <u>Jameson v. Coughlin</u>, 22 F.3d 427, 430 (2d Cir. 1994) (when habeas petitioner fails to satisfy first <u>Strickland</u> prong, district court "need not reach the State's additional argument that the [petitioner] was not prejudiced").

VI.     Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties are hereby directed that if they have any objections to this Report and Recommendation, they must, within fourteen days from today, make them in writing, file them with the Clerk of the Court, and send copies to the chambers of the Honorable Sidney H. Stein, United States District Judge, and to the chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, N.Y. 10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Stein.  Any failure to file timely objections will result in a waiver of those objections for purposes of appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).

Dated:       New York, New York
             May 18, 2011

_____
FRANK MAAS
United States Magistrate Judge

34

Copies to:

Raul Davis
03-A-2219
309 Bare Hill Road
P.O. Box 2001
Malone, New York 12953

Nancy Killian, Esq./Mary Jo Blanchard, Esq.
Assistant District Attorneys
Office of the District Attorney, Bronx County
198 East 161st Street
Bronx, New York 10451